# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cesar de la Garza,

      Plaintiff,

v.

Joan Fabian, et al.,

      Defendants.

Civil No. 06-208 (RHK/JJG)

**REPORT
AND
RECOMMENDATION**

JEANNE J. GRAHAM, United States Magistrate Judge

This matter comes before the undersigned for resolution of dispositive motions. Plaintiff Cesar de la Garza is proceeding pro se. Kelly S. Kemp, Assistant Minnesota Attorney General, is representing the defendants. The dispositive motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1(b).

## I. INTRODUCTION

During all events relevant to this litigation, Mr. de la Garza (de la Garza) was imprisoned in Minnesota state prisons, chiefly the one in Oak Park Heights. Because of several violations of prison rules, de la Garza received disciplinary sanctions. These sanctions included his placement into a disciplinary segregation unit, called the "Administrative Control Unit" (the ACU), at Oak Park Heights.

The seven defendants here are prison officials who, according to de la Garza, committed a wide range of constitutional violations in connection with his imprisonment and placement into the ACU. The defendants consist of Joan Fabian, the Minnesota Commissioner of Corrections; Erik Skon, Assistant Commissioner of Corrections; Lynn Dingle and Jessica Symmes, wardens

at the Oak Park Heights prison; Lcie Stevenson, program director for the ACU; Mark Thielen, a supervisory officer at the ACU; and Jane Norman, a law librarian at Oak Park Heights.  (Exh. 1 at 1-2.)[1]

Based on the defendants' alleged constitutional violations, de la Garza chiefly advances claims under 42 U.S.C. § 1983.  Due to the volume of claims and the wide range of theories that de la Garza presents in his papers, it is not helpful to supply a complete recitation of the facts at this point.  Briefly put, de la Garza contends that the defendants (1) violated his right of access to the courts; (2) engaged in retaliation or retaliatory discipline; (3) maintained unlawful conditions of confinement; (4) violated procedural due process when deciding whether to place him into the ACU; and (5) violated equal protection through racial discrimination.

The defendants now move for summary judgment (Doc. No. 165) against all claims.  De la Garza did not timely file papers opposing this motion and has yet to do so.  Before responsive briefing to the defendants' motion for summary judgment was due, de la Garza also moved for an extension of this deadline.  For reasons that will be explained later on, this motion is properly denied.

Prior to the defendants' motion, however, de la Garza did move "for trial on the merits" (Doc. No. 156), submitting a fifty-six page memorandum and more than 700 pages of exhibits. From the volume of exhibits submitted in support of this motion, this Court may infer that these exhibits present all the evidence de la Garza has to support his claims.  Furthermore, the motions for trial are inconsistent with summary judgment and, as a practical matter, amount to argument against summary judgment.  So when analyzing the defendants' motion for summary judgment,

---

[1]        Exhibits are cited in an appendix at the end of this report.

this Court also considered the arguments and evidence de la Garza presents through his motion for trial.

## II.     DISCUSSION

### A.     General Principles

#### 1.     Standard of Review

To obtain summary judgment, a party must show that there are no issues of material fact and that it is entitled to a judgment as a matter of law. *DG&G, Inc. v. Flexsol Packaging Corp.*, 576 F.3d 820, 823 (8th Cir. 2009). For an issue of material fact to be present, there must be sufficient evidence for a reasonable juror to return a verdict for the nonmoving party. *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006).

Pursuant to this standard, all reasonable inferences are taken in favor of the nonmoving party. *Singletary v. Missouri Dep't of Corrections*, 423 F.3d 886, 890 (8th Cir. 2005). But when taking reasonable inferences, a court need not accept self-serving affidavits from the nonmoving party. The nonmoving party instead must cite sufficient, relevant evidence that permits a verdict in its favor. *Bacon v. Hennepin County Medical Center*, 550 F.3d 711, 716 (8th Cir. 2008). For this reason, the nonmoving party cannot avoid summary judgment through general citations to a voluminous record. *Tolen v. Ashcroft*, 377 F.3d 879, 883 n. 3 (8th Cir. 2004).

#### 2.     Qualified Immunity

There is one topic that, notwithstanding the form of misconduct at issue, is often material throughout the following analysis. The defendants invoke qualified immunity, which protects government officials who perform discretionary functions from § 1983 liability. This doctrine is often described as immunity for all but "the plainly incompetent and those who knowing violate

the law." *Ambrose v. Young*, 474 F.3d 1070, 1077 (8th Cir. 2007) (indirectly quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Once government officials invoke qualified immunity, a plaintiff must demonstrate two elements: that a constitutional right was violated, and that this right was clearly established at the time of the violation. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009). If the plaintiff fails to establish either element, then qualified immunity attaches and government officials are entitled to summary judgment. Where the second element is dispositive, moreover, a court also has discretion to consider that element and bypass the first element. *Pearson v. Callahan*, 129 S.Ct. 808, 818-19 (2009) (unanimous decision).

The second element, whether a constitutional right is clearly established, is often material here and this element merits additional discussion. A constitutional right is clearly established where, from the perspective of a reasonable official in similar circumstances, that official would understand that certain conduct violated the constitution. *Engleman v. Murray*, 546 F.3d 944, 947 (8th Cir. 2008).

This inquiry is often framed as whether the law, at the time of the conduct, provided "fair warning" that the conduct was wrong. *See, e.g., Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007) (quotation omitted). Consistent with this principle, an official is only liable for "transgressing bright lines," not "bad guesses in gray areas[.]" *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009).

### B. Substantive Claims

#### 1. Access to Courts

##### a. Background

Throughout his complaint, de la Garza contends that the defendants unconstitutionally violated his right of access to the courts. Some of the purported violations may be described as follows:

- Prison regulations limited de la Garza's access to his legal papers and thus inhibited his litigation activity.

- By reading, seizing, or destroying his legal papers, prison officials discouraged or prevented de la Garza from candidly disclosing relevant information in his court filings.

- Prison officials restricted de la Garza's access to a law library and limited his ability to copy from law books, preventing him from litigating effectively or meeting court-ordered deadlines.

- When de la Garza was engaged in legal activity, prison employees retaliated through abuse, retaliatory discipline, and seizure of legal resources from his cell.

- When de la Garza challenged prison officials' violations of his access to the courts, the officials obstructed his challenges by restricting his access to the prison grievance system.

De la Garza further contends that, because of this conduct, the defendants adversely affected his efforts in three lawsuits.

The first is *De la Garza v. State*, a post-conviction review proceeding where de la Garza challenged the criminal conviction that led to his imprisonment. He evidently filed this action in state district court in August 2004. (Exh. 2 at 1.) The state district court then held an evidentiary hearing on November 17, 2004. By an order on February 28, 2005, it denied further relief. De la Garza then appealed to the Minnesota Court of Appeals, which affirmed the state district court in

an unpublished opinion on July 18, 2006. *See De la Garza v. State*, No. A05-845, 2006 WL 1984604 (July 18, 2006), *rev. denied* (Minn. Sept. 27, 2006).

Among other arguments, de la Garza contends that because prison officials did not grant him sufficient access to legal resources, he was unable to subpoena witnesses for the November 17 hearing. But he does not say how the witnesses' testimony might have altered the outcome of the proceeding. De la Garza elsewhere implies that, because prison officials inhibited his access to his legal papers, he could not make court filings or mount an effective appeal. But he does not identify any particular papers or information that he was unable to present to the state courts.

The second lawsuit is *De la Garza v. Pawlenty*, an action de la Garza filed in this District on March 23, 2004. No. 04-1362 (D.Minn.) Because de la Garza had not accomplished service of process, Magistrate Judge Jonathan G. Lebedoff issued an order on May 10, 2004. It provided de la Garza with specific instructions on how to accomplish service, by filing a service form and a copy of his complaint. But de la Garza did not do so, and instead, attempted to file an amended complaint. By an order on July 15, 2004, Judge Lebedoff allowed the amendment and granted de la Garza another opportunity to accomplish service, again supplying instructions.

De la Garza did not accomplish service in the time allowed under the July 15 order. As a result, Judge Lebedoff issued a report on August 25, 2004, recommending that the litigation be dismissed without prejudice for failure to serve. De la Garza did not file any timely objections to the August 25 report. Through an order on October 13, 2004, Judge Richard H. Kyle summarily adopted the August 25 report, and the litigation was dismissed without prejudice. De la Garza appealed to the Eighth Circuit in June 2005. No. 05-2878 (8th Cir.). It summarily dismissed the appeal, for failure to prosecute, by a judgment on September 2, 2005.

With regard to this litigation, de la Garza focuses on the issues with service.  Had prison officials granted him access to the Civil Rules and other legal resources, de la Garza contends, he could have learned how to accomplish service and pursued the lawsuit.

The third lawsuit is *Hines v. Anderson*, a class action lawsuit that apparently challenged how Minnesota state prisons operate their medical facilities.  No. 73-387 (D.Minn.).  The record shows that, in late 2005, class counsel inadvertently mailed other prisoners' confidential medical information to de la Garza.  (Exh. 3.)  This prompted prison officials to retrieve the information in a search of his cell on December 13, 2005.  (Exh. 4; Exh. 5.)

A receipt from the day of the search shows that prison staff seized twenty-two pages of documents, described as "Maslon—Hines v. Anderson 3 pages" and "19 page legal document w/ medical info."  (Exh. 4.)  According to the defendants, the three-page document is a letter from Mary Vasely, class counsel, to the Minnesota Attorney General's Office.  (Exh. 6.)  The other is a nineteen-page report and recommendation in the *Hines* litigation, which was later placed under seal by a court order.  (Exh. 7; Exh. 8.)  The defendants have offered copies of these documents that correspond to those described in the receipt.

De la Garza implies that, when prison staff conducted the December 13 search, they may have seized documents relevant to his other litigation.  He alternatively argues that he needed the information to participate in the *Hines* class action; that its seizure prevented him from preparing an affidavit for the class action; and that the incident ultimately poisoned his relationship with class counsel.

**b.      Actual Injury**

The defendants argue in relevant part that an access-to-courts claim requires proof of an actual injury. They accordingly argue that, because de la Garza has not offered such proof, they are entitled to summary judgment on all access-to-courts claims.

The precise constitutional basis of a prisoner's right of access to the courts has yet to be expressly identified. *See White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007) (citing due process and equal protection). But as a general principle, a prisoner cannot advance an access-to-courts claim without proof of an actual injury, meaning "the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Bandy-Bey v. Crist*, 578 F.3d 763, 765 (8th Cir. 2009).

To establish such hindrance, there must be some evidence that conduct by prison officials adversely affected the outcome of a prisoner's litigation. *See, e.g., Entzi v. Redmann*, 485 F.3d 998, 1005 (8th Cir. 2007) (affirming summary judgment where prisoner was unable to show how prison policies prevented him from timely filing habeas petition); *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (upholding summary judgment where prisoner did not specify a legal claim that was prejudiced by prison officials' interference); *Cody v. Weber*, 256 F.3d 764, 770 (8th Cir. 2001) (ruling that, where prison officials limited a prisoner's access to voluminous legal papers, he "could not avoid summary judgment because he did not designate specific facts showing that he suffered prejudice") (favorably citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)).

This principle is controlling here. Assuming for the sake of argument that prison officials prevented de la Garza from presenting information in the state post-conviction proceeding, de la Garza does not say what that information is or how it might affect the outcome. And because the *Pawlenty* case was dismissed without prejudice, there was no ruling on the merits. De la Garza then could have refiled the lawsuit and cured the defects in service. *See generally Norsyn, Inc. v.*

*Desai*, 351 F.3d 825, 831 (8th Cir. 2003); *Norman v. Arkansas Dep't of Education*, 79 F.3d 748, 751 (8th Cir. 1996).

Similar concerns apply to the *Hines* litigation. Setting aside unsubstantiated claims by de la Garza, the record shows the December 13 seizure only involved a seizure of other prisoners' medical information. And de la Garza does not say how these documents were useful, or would have influenced the outcome, in the *Hines* litigation. For that matter, if de la Garza was expected to provide an affidavit regarding his medical care, then the medical records of other prisoners are immaterial.

In connection with the three lawsuits at issue here, de la Garza has not established actual injury to support his access-to-courts claims. As a result, there is no constitutional violation and summary judgment is appropriate for these claims.

### c.      Legitimate Penological Interest

The defendants alternatively argue that, to the extent that de la Garza challenges prison policies that govern access to legal resources, there are legitimate penological interests that justify those policies. Notwithstanding the prior determination that there was no actual injury, this argument merits some additional attention.

This argument can be derived from two Eighth Circuit cases, *Cody v. Weber* and *Goff v. Nix*, which implicitly suggest two theories of access-to-courts claims. *Cody v. Weber*, 256 F.3d 764 (8th Cir. 2001); *Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997). These cases evidently distinguish two sets of circumstances: one where prison officials foreclose access to legal papers by seizing or destroying them; and another where prison officials restrict when or where a prisoner reviews legal papers. *See generally Cody*, 256 F.3d at 767-70.

Where access is restricted but not foreclosed, the prisoner has the burden to show actual injury, as discussed beforehand. *See id.* at 770 (ruling that, where a prisoner could not show how restrictions on access to his legal papers caused him prejudice, the prisoner failed to show actual injury). But where access is entirely foreclosed, these cases imply that actual injury should be presumed. *See id.* at 767-68 ("[T]aking of legal papers will often . . . interfere with an inmate's right of access . . . . We will not deny relief on the unsupported assumption that the papers involve only frivolous claims.") (quoting *Goff*, 113 F.3d at 892).

Based on this presumption, the cases then apply the balancing test that the U.S. Supreme Court announced in *Turner v. Safley*. 482 U.S. 78 (1987). Consistent with this test, where the destruction or withholding of a prisoner's legal papers burdens a constitutional right, that action must be reasonably related to a legitimate penological interest. *See Cody*, 256 F.3d at 767-68. In both *Cody* and *Goff*, the Eighth Circuit concluded that prison officials offered no justification for their intrusion into prisoners' legal papers, and accordingly reversed summary judgment. *Cody*, 256 F.3d at 768-69; *Goff*, 113 F.3d at 890-91.

Notwithstanding *Cody* and *Goff*, subsequent Eighth Circuit cases have not presumed actual injury, even where prison officials allegedly prevented a prisoner from accessing legal resources. *See Johnson v. Hamilton*, 452 F.3d 967, 973-74 (8th Cir. 2006); *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003). Moreover, *Cody* is less persuasive becuase it arguably expands the reach of *Turner* beyond prison policies, suggesting its balancing test applies to misconduct by prison officials. *See Turner*, 482 U.S. at 89 (supplying a balancing standard for determining whether prison regulations violated prisoners' constitutional rights).

Setting aside these reservations, the defendants argue that to the extent their policies limit de la Garza's access to his legal papers, the policies are justified under the *Turner* balancing test.

Assuming this test applies, it generally requires courts to be flexible and defer to prison officials' judgment. To determine whether a challenged regulation is reasonably related to legitimate penological interests, relevant factors include (1) whether there is a rational connection between the regulation and the interests advanced to justify it; (2) whether there are alternative means to preserve prisoners' rights; (3) the effect that accommodation of prisoners' rights will have on the prison resources; and (4) whether there is any reasonable alternative. *Turner*, 482 U.S. at 89-90.

The policies challenged by de la Garza may be summarized as follows:

- Prisoners in disciplinary or administrative segregation cannot keep more than five pounds of legal papers in their cell. (Exh. 9 at 5; Exh. 10 at 3; Exh. 11 at 4.)

- Prisoners cannot keep more than two footlockers of personal belongings outside their cell, including any legal papers that cannot be stored within their cell. Any excess papers must be mailed or destroyed. (Exh. 12; Exh. 13; Exh. 14.)

- Prisoners may obtain legal papers from their footlockers by request at particular times—originally once per week, and after this policy was amended in 2005, once per month—with exceptions for prisoners with imminent court deadlines. (Exh. 9 at 5; Exh. 10 at 7; Exh. 11 at 7; Exh. 15; Exh. 16.)

- Prisoners may only retrieve so many pages from the law library—originally 100 per week, and after this policy was amended in July 2004, 50 per week. (Exh. 17; Exh. 18; Exh. 19 at 2-3.)

According to Stevenson, there are several reasons for such property limits: to prevent fires, limit concealment of contraband, and facilitate searches of cells. (Exh. 9 at 3; Exh. 11 at 9.) Reports from other prison officials indicate further concerns about availability of prison resources. (Exh. 12; Exh. 20; Exh. 21.)

The challenged policies here offer rational ways to maintain prison security and allocate limited prison resources. Prison officials cannot be expected to grant prisoners unlimited access to legal resources simply because a prisoner has filed a lawsuit. Nor is it proper for a court to decide, for instance, how many documents a prisoner can copy in a week.

With due regard to prison administration, the policies at issue here are reasonably related to legitimate penological interests. Assuming that it is proper to apply the *Turner* balancing test here, it demonstrates that the challenged policies do not unduly burden access to the courts. So this theory may supply an alternative rationale for summary judgment. *See Zenanko v. LaFleur*, 228 F.3d 933, 933 (8th Cir. 2000) (per curiam) (summarily holding that Minnesota state prisons' property policies were reasonably related to legitimate penological interests).

Qualified immunity is also applicable in these circumstances. When setting policies for access to legal papers and legal resources, prison officials make discretionary decisions about the prison security and the allocation of prison resources. And even now, the law does not supply clear guidance regarding the scope of prisoners' access to legal resources. A reasonable prison official would not have fair warning that any of the challenged policies are unconstitutional, and therefore, none of the challenged policies violate a clearly established constitutional right. This Court concludes that the defendants are also shielded by qualified immunity here.

### 2. Retaliation and Retaliatory Discipline

#### a. Background

De la Garza further contends that prison officials engaged in various forms of retaliation. Some of these claims are coextensive with his access-to-courts claims, and to the extent that de la Garza alleges prison officials retaliated against his litigation activity, those issues are governed by the preceding analysis. But de la Garza also contends that prison staff engaged in a lengthy pattern of abuse, principally consisting of assaults in February and September 2004; retaliatory discipline in connection with an incident in August 2005; and ongoing threats from September to December 2005. (Exh. 22 at 7, 16, 23, 25.)

The parties' motion papers generally do not substantiate these allegations. But the record does have allegations of harassment that may encompass some events described in the complaint. These allegations are traceable to multiple grievances that de la Garza submitted to prison staff from approximately January 2005 through April 2006.

The record shows that, through pending grievances in January 2005, de la Garza accused prison staff in the ACU of harassment. Among other concerns, he alleged that prison staff were arbitrarily turning his plumbing on and off. After investigation, these grievances were denied for lack of proof. In a report on February 10, 2005, Skon upheld these decisions and dismissed the grievances. (Exh. 23.)

De la Garza later filed another grievance and claimed that, on May 1, 2005, a female staff member whistled at him through the intercom. (Exh. 24.) This grievance was initially denied, and during ensuing appeals by de la Garza, the incident was reviewed by Stevenson and Dingle. Stevenson determined that no female staff were working during the incident, and Dingle upheld this finding, concluding that de la Garza did not substantiate the incident. (Exh. 25; Exh. 26.)

Through grievances in September 2005, de la Garza continued to allege that ACU staff were engaged in harassment and misconduct. In particular, he accused staff of making offensive noises at him over the intercom. (Exh. 27; Exh. 28.) Thielen first responded that Stevenson was investigating these complaints. But through an ensuing response "on behalf of Program Director Stevenson" on September 19, 2005, Thielen stated,

> You are directed to cease writing kites regarding this issue . . . .
> Your claims are unfounded and have no grounds for further
> investigation. You are abusing the kite system.

(Exh. 28.)

De la Garza then appealed, arguing that the abuse was occurring and that ACU staff were shutting down his access to the grievance system. The appeals were considered by both Symmes and Skon. In a report on October 12, 2005, Symmes considered interviews with prison staff and found no misconduct had taken place. (Exh. 29.) Skon affirmed, and rejected other charges of misconduct, through reports on October 23 and October 31, 2005. (Exh. 30; Exh. 31.)

In his papers, de la Garza also submits multiple grievances that he purportedly submitted to prison staff between January and April 2006. (Exh. 32.) The record does not indicate whether prison staff took action on the grievances, or whether these concerns were called to the attention of any of the defendants in this litigation.

### b.     Supervisory Liability

Among other arguments, the defendants assert that these retaliation claims are foreclosed by principles of supervisory liability. The underlying rule here is, when a claim is brought under § 1983, there is no respondeat superior liability. This means a supervisor cannot be liable for the misconduct of a subordinate simply because of the supervisory relationship. *See, e.g., Hughes v. Stottlemyre*, 454 F.3d 791, 798 (8th Cir. 2006). Consistent with this principle, a prison warden is not liable for misconduct by prison employees just because the warden is generally responsible for supervising prison operations. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007); *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007).

A supervisor will be liable for subordinates' misconduct, however, where the supervisor either directly participates in the misconduct, or fails to train or supervise those subordinates. So when a § 1983 claim is asserted against a supervisor based on the conduct of subordinates, but there is no evidence that the supervisor either participated, failed to train, or failed to supervise,

the supervisor is entitled to summary judgment against that claim. *Riehm v. Engelking*, 538 F.3d 952, 962-63 (8th Cir. 2008).

To determine whether a supervisor has failed to train a subordinate, the standard is one of deliberate indifference. For failure to supervise, the standard is either deliberate indifference or tacit authorization of the misconduct. *Brockinton v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007). Deliberate indifference is a stringent standard, requiring the plaintiff to prove the supervisor recklessly disregarded a risk of constitutional harm. *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007).

To establish recklessness, there must be some evidence to show that the supervisor was aware of inadequate training or supervision. *See Vaughn v. Greene County*, 438 F.3d 845, 851 (8th Cir. 2006) (upholding summary judgment where plaintiff did not show that jail supervisor had knowledge about inadequate training or supervision, or that such inadequacies were likely to result in constitutional harm); *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (affirming summary judgment for prison supervisory officials where inmate could not show that prison staff received insufficient training on medical emergencies).

Turning to the claims of retaliatory conduct here, the record does not establish that any defendants directly participated in such misconduct. So the question then becomes whether the defendants either failed to train or supervise their subordinates.

The record here demonstrates that, when de la Garza reported misconduct, prison staff investigated these charges. In reliance on these investigations, the defendants determined that no misconduct had occurred. For instance, as early as September 2005, Stevenson determined that de la Garza's "claims [were] unfounded." And in their October 2005 reports, Symmes and Skon affirmed these findings.

Even with all reasonable inferences in de la Garza's favor, this record cannot establish a failure to train or supervise subordinates. There is no evidence that Skon, Symmes, or Stevenson—or any other defendant—was aware of misconduct by prison staff. Without such knowledge, there can be no tacit authorization of misconduct, nor reckless disregard of constitutional harm. None of the defendants, therefore, can be liable under § 1983 for the alleged retaliatory conduct of their subordinates. For this reason, the defendants are also entitled to summary judgment on all retaliation and retaliatory discipline claims.

### 3. Conditions in Disciplinary Segregation

#### a. Background

De la Garza also advances several challenges regarding the ACU unit, arguing that the conditions there violate multiple constitutional provisions. Once again, some of these arguments are coextensive with the prior access-to-courts and retaliatory conduct claims, and those matters may rest on the preceding analysis. But there remain colorable challenges, based on the Fourth and Eighth Amendments and due process.

The record shows that the ACU is a segregated unit. Prisoners are placed there for either administrative reasons, where a prisoner must be separated from other offenders for the safety of that prisoner, prison staff, or other prisoners; or disciplinary reasons, as a sanction for a prisoner who has violated prison rules. As many prisoners there have violated prison rules, they present a higher security risk and are subject to strict security measures. (Exh. 9 at 2-3.) The defendants admit that such measures include surveillance via video cameras mounted in each cell. (Exh. 33 at 3-4.)

In the control room for the ACU, prison staff can use an intercom to speak with prisoners. (Exh. 26; Exh. 29.) There is also some evidence, consisting of allegations from de la Garza, that

staff remotely controls lights and plumbing in each cell.  (Exh. 23; Exh. 32.)  When incarcerated

in the ACU, prisoners have no contact with one another.  They remain in their cells twenty-three

hours each day and are allowed to exercise outside their cell one hour per day.  (Exh. 9 at 2-3;

Exh. 11 at 5-6.)

Between video surveillance and direct observation, prison staff can observe prisoners in

the ACU at all times, including when prisoners use the toilet or shower.  Prison officials assign

employees of both sexes to the ACU, and as a result, prisoners may be viewed by opposite-sex

prison staff while unclothed or using the toilet.  (Exh. 9 at 6; Exh. 33 at 3-4.)

De la Garza argues that these conditions are unconstitutional.  As discussed beforehand,

he accuses prison staff of using their control of lights and plumbing to engage in harassment.  He

also alleges that he has suffered significant psychological harm, because of his lengthy isolation

and the ongoing surveillance, including the fact that opposite-sex staff observed him conducting

his private hygiene.  De la Garza further contends that prison officials maintain these conditions

as part of a scientific experiment on prisoners, but the record lacks credible evidence to support

this claim.

Based on these allegations, De la Garza contends that the defendants violated the Fourth

and Eighth Amendments, as well as due process.

### b.       Fourth Amendment

De la Garza relies in part upon the Fourth Amendment, which generally protects a person

from unreasonable searches of that person's body or belongings.  But when imprisoned, much of

these rights are lost; prisoners have no Fourth Amendment expectation of privacy in their cells or

belongings.  *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984).  As de la Garza generally focuses

his conditions-of-confinement arguments upon observation of his unclothed body, the defendants thus counter that he has no Fourth Amendment expectation of privacy in this context either.

Though there are rare circumstances where observation of an unclothed prisoner may be problematic, ordinary observation of unclothed prisoners by prison staff of the opposite sex does not violate the Fourth Amendment. *Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002); *Timm v. Gunter*, 917 F.2d 1093, 1097-99 (8th Cir. 1990); *Robinson v. Boulier*, 121 F.3d 713 (mem.), 1997 WL 546036 at *1 (8th Cir. 1997) (per curiam); *cf. Hill*, 311 F.3d at 903-04 (holding that Fourth Amendment privacy interests attached where unclothed prisoner was forcibly restrained, and viewed by opposite-sex prison staff, for an unreasonable amount of time).

When the record is viewed with reasonable inferences in de la Garza's favor, it indicates that prison staff of the opposite sex may be able to view him unclothed, including when he uses the toilet or shower. But such observation is part of the routine duties performed by prison staff in the ACU, and there is no indication that this surveillance is unnecessarily intrusive. For these reasons, there is no Fourth Amendment violation solely because de la Garza may be seen without clothes by opposite-sex prison staff.

Assuming that any constitutional concerns remain, it is appropriate to consider qualified immunity here. The defendants exercise discretion when operating the ACU, by weighing prison security measures against the availability of prison resources, and so the defendants may invoke qualified immunity.

Due to this invocation, de la Garza must then show in material part that the conditions in the ACU violate a clearly established right. Based on the prior review, however, case law offers no meaningful indication that conditions in the ACU are unlawful. A reasonable official in the defendants' position, therefore, would not have fair warning the conditions in the ACU violate

the Fourth Amendment.  There being no clearly established right, de la Garza cannot overcome the defendants' invocation of qualified immunity.

### c.     Eighth Amendment

De la Garza also advances claims under the Eighth Amendment, which forbids cruel and unusual punishment.  To establish an Eighth Amendment violation on conditions of confinement, a prisoner must show that (1) the objective conduct of prison officials was a sufficiently serious deprivation of constitutional rights; and that (2) the subjective intent of those officials amounted to deliberate indifference to a serious risk of harm.  *See, e.g., Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

Few Eighth Circuit cases have examined when conditions in a disciplinary segregation unit may violate the Eighth Amendment.[2]  Where a prisoner was kept in segregation for twenty-six months; was allowed few privileges or possessions; and could not exercise outdoors, there was no serious deprivation.  *Rahman X v. Morgan*, 300 F.3d 970, 973-74 (8th Cir. 2002); *see also Brown v. Nix*, 33 F.3d 951, 955 (8th Cir. 1994) (summarily finding no Eighth Amendment violation where prisoner received sanctions totaling nine years in segregation).  Other cases have upheld brief detention in "strip cells," in which a prisoner is isolated without clothing or bedding, where prison officials had no reason to know that the prisoner was suffering harm.  *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995); *Williams v. Delo*, 49 F.3d 442, 445-47 (8th Cir. 1995).

---

[2]    The contemporary two-part standard, for determining whether there is a violation of the Eighth Amendment, was announced by the U.S. Supreme Court in *Farmer v. Brennan*.  511 U.S. 825, 834 (1994).  Before this decision, Eighth Circuit authorities examined conditions like those at issue in the current litigation.  *See, e.g., Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (ruling that, when prisoner was only allowed one hour of exercise outside of his cell each day, there was no violation of the Eighth Amendment).  As these cases apply another standard, they do not materially advance the analysis here.

When compared to the current litigation, these cases are generally distinguishable. They do not clearly indicate whether conditions in the ACU are unlawful. Consistent with the Fourth Amendment analysis, the defendants have properly invoked qualified immunity, and there is no clearly established law that overcomes this immunity. Summary judgment is appropriate here as well.

### d.     Due Process

The remaining basis de la Garza presents for his conditions-of-confinement claims is due process. Where the bodily integrity of a prisoner is implicated, there is a violation of due process where prison officials are deliberately indifferent to a constitutional right in a manner that shocks the conscience. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004).

The Eighth Circuit has yet to devote much attention to this rule, and therefore, existing law offers little guidance on whether conditions in the ACU might "shock the conscience." *See Revels*, 382 F.3d at 875-76 (finding no violation of due process where psychiatric detainee was briefly denied access to a bathroom). For reasons that have as much or greater force here than in the context of the Fourth and Eighth Amendment claims, qualified immunity is appropriate. This outcome means that, regardless of the theory underlying de la Garza's conditions-of-confinement claims, summary judgment is proper for these claims.

### 4.     Due Process

In addition to the due process claim founded on conditions of confinement, de la Garza presents one other due process issue. Citing the Supreme Court decision in *Wilkinson v. Austin*, de la Garza contends that his placement into the ACU violated due process. 545 U.S. 209 (2005) (unanimous decision).

The *Wilkinson* Court considered two issues. It initially considered whether prisoners had a due process liberty interest against placement in a supermaximum security prison. Concluding there was, the Court then examined what procedural due process should be afforded to prisoners before such placements. 545 U.S. at 223-25.

De la Garza argues that the conditions in the ACU are comparable to the supermaximum prison at issue in *Wilkinson*, and thus he contends that prior to his placement into the ACU, the defendants violated his procedural due process rights. The defendants do not contest whether de la Garza has a due process liberty interest, and instead contend that if any process was due, de la Garza received ample procedural protections.

The record demonstrates that prison officials placed de la Garza in the ACU for multiple violations of prison rules. (Exh. 34.) Due to the frequency and severity of these violations, de la Garza was housed in the ACU during most events relevant to this litigation. (Exh. 35.) But in his papers, de la Garza does not specify a particular sanction or disciplinary hearing that violated due process. He instead appears to challenge this process itself.

The defendants accordingly counter with evidence about the disciplinary process. Some of this evidence consists of the policies that control prison disciplinary proceedings. (Exh. 36; Exh. 37.) The defendants also submit records from selected disciplinary proceedings against de la Garza, which illustrate how prison officials conducted these proceedings.[3] (*See, e.g.,* Exh. 38; Exh. 39.)

---

[3] The defendants devote some argument to a related question. They address whether de la Garza was denied procedural due process when he was transferred between the segregation units of the Minnesota state prisons at Oak Park Heights and Stillwater. But de la Garza does not raise this issue in his complaint, and the record otherwise lacks meaningful evidence about it. This Court concludes that, as the underlying claim was not pleaded to begin with, the issue need not be considered. *Cf. Northern States Power Co. v. Federal Transit Adm'n*, 358 F.3d 1050, 1057

This record shows that, if an alleged rule violation may result in placement in the ACU, a prisoner receives notice of the violations and the opportunity to request a hearing. (Exh. 36 at 3-4, 5-7; Exh. 37 at 2-3; Exh. 40 at 2-5.) If the hearing officer imposes sanctions, then the prisoner may appeal this ruling and seek review from supervisory prison officials. (Exh. 36 at 7; Exh. 40 at 6.) Of the disciplinary proceedings that are part of the record here, they indicate that de la Garza received notice, an opportunity to be heard, and a right of appeal pursuant to prison policy. (*See, e.g.,* Exh. 41; Exh. 42.)

Being advised of this record, the issue then becomes whether procedural due process is satisfied here. In the *Wilkinson* decision, the Court applied the three-part procedural due process framework from *Mathews v. Eldridge*. 424 U.S. 319 (1976). This framework requires a court to weigh (1) the private interest affected by the official action; (2) the risk existing procedures will erroneously deprive that interest and the value of additional safeguards; and (3) the governmental interests in managing procedural burdens and the cost of additional safeguards. *Wilkinson*, 545 U.S. at 224-25 (quoting *Mathews*, 424 U.S. at 335).

Examining these factors, the Court gave less weight to the private interests of prisoners. It reasoned that, compared to issues such as parole or revocation of good time credits, placement into segregation involved less significant liberty interests. *Id.* at 225. The Court then found that an informal, nonadversary procedure, including a right of appeal to supervisory prison officials, was an appropriate safeguard against erroneous placements. *Id.* at 225-27. And due to concerns about prison security and costs of prison administration, the Court also found that governmental interests weighed against more procedural safeguards. *Id.* at 228. The *Wilkinson* Court thus

---

(8th Cir. 2004) (holding that in summary judgment practice, where the nonmoving party asserted a claim not evident from its complaint, the claim could not be advanced in summary judgment).

upheld a nonadversary procedure where prisoners could not call witnesses but received notice, an opportunity to be heard, and a right to appeal. *Id.* at 228-29.

In the current litigation, de la Garza fails to identify any particular incident where the defendants denied procedural due process. The record otherwise shows that, before de la Garza received the disciplinary sanctions that led to his placement in the ACU, he received significant procedural protections. At a minimum, these included notice, an opportunity to be heard, and a right of appeal, which satisfies the procedural requirements upheld in *Wilkinson*.

There is not sufficient evidence in the record, therefore, for a reasonable juror to conclude that de la Garza was denied procedural due process. For this reason, the defendants are entitled to summary judgment on this question.

### 5.     Equal Protection

The only other outstanding claim from de la Garza is one for violation of equal protection under the Fourteenth Amendment. He argues that, when the defendants decided which prisoners to place in the ACU, they discriminated on the basis of race. The defendants counter that there is no proof that de la Garza was treated differently from other similarly situated prisoners, and also that there is no evidence that they intentionally discriminated against any prisoners due to their race.

There is no need to address the defendants' first argument because their second argument is fully dispositive here. To demonstrate a claim for equal protection, a prisoner must establish that prison officials intentionally discriminated against members of a particular class. If there is no proof of intentional discrimination, prison officials are entitled to summary judgment. *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (upholding summary judgment where prisoner did

not show evidence of intentional race discrimination); *see also Klinger v. Dep't of Corrections*, 31 F.3d 727, 733 (8th Cir. 1994) (sex discrimination).

Examining the record with all reasonable inferences for de la Garza, there is insufficient evidence for a reasonable juror to conclude that the defendants were engaged in intentional race discrimination. As a result, the defendants should also receive summary judgment on the equal protection claim.

### C. Residuary Arguments

#### 1. Supplemental Jurisdiction

The preceding analysis fully disposes of all of de la Garza's claims under § 1983. But in his complaint, de la Garza also presents issues under state law. To the extent that he has pleaded state-law claims, the defendants contend that there is no subject matter jurisdiction. They begin with the correct premise that subject matter jurisdiction here is founded on a federal question. If none of the federal claims in this litigation remain viable, they argue, then there is no appropriate reason for a federal court to exercise supplemental jurisdiction over any state-law claims.

A federal court may decline supplemental jurisdiction after it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). When deciding whether to do so, the court should examine concerns such as judicial economy, fairness, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988). If subject matter jurisdiction is founded on a federal question, and all federal claims are dismissed before trial, then these concerns favor declining supplemental jurisdiction over any remaining state law claims. *See, e.g., Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009).

Assuming that all § 1983 claims are disposed by summary judgment, there may be some remaining state-law claims here. As a matter of economy, fairness, and comity, these claims are

best committed to decision in the state courts. In these circumstances, it is appropriate to decline supplemental jurisdiction and dismiss any state-law claims without prejudice.

### 2. Official-Capacity Claims

The defendants also mount arguments that attack the claims against them in their official capacity. They assert that, when they are named in their official capacity, an action against them must be instead treated as an action against the state. As a result, they argue that these claims are foreclosed by sovereign immunity, *Morstad v. Dep't of Corrections and Rehabilitation*, 147 F.3d 741, 743-44 (8th Cir. 1998), or alternatively that the state cannot be sued under § 1983, *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008).

Even if these arguments prevail, de la Garza brought action against the defendants in both their official and individual capacities. The official-capacity claims may fail, but the individual-capacity claims still must be considered on their merits. *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997); *Williams-Bey v. Kempker*, 192 Fed.Appx. 569, 571 (8th Cir. 2006). As none of the underlying claims are viable in any event, there is no need to distinguish official-capacity and individual-capacity claims. The arguments against the official-capacity claims, therefore, do not require independent analysis.

### 3. Injunctive Relief

In his complaint, de la Garza also seeks injunctive relief, to compel the defendants to cure various constitutional deficiencies in the ACU. Observing that de la Garza is no longer housed in Minnesota state prisons, they argue that de la Garza cannot allege any continuing violations of federal law there and thus cannot obtain injunctive relief against them. *See Green v. Mansour*, 474 U.S. 64, 66-67, 73 (1985). But if de la Garza has no surviving claims, there is no basis for injunctive relief, and this concern need not be addressed either.

### D. Nondispositive Motions

Although this Court has fully considered all dispositive motions, there are a few pending nondispositive motions. In the interests of efficiently bringing this litigation to a conclusion, this Court will briefly address these nondispositive motions in this report.

In a motion for a ruling on nondispositive motions (Doc. No. 140), de la Garza asks for a ruling on some prior discovery motions. This Court decided the underlying discovery motions in an order on June 16, 2009, and thus the motion for a ruling is properly denied as moot. De la Garza also moves for appointment of counsel (Doc. No. 175). This is his fourth such motion and there are no new developments, since he last moved for appointment of counsel, which justify a different result now. Consistent with the rulings on the prior motions, this motion is denied.

De la Garza also moves for an extension of time to respond to the defendants' motion for summary judgment (Doc. No. 177). This Court first observes that, under the pretrial scheduling order of February 13, 2009, de la Garza had thirty days to respond to the defendants' motion.

As mentioned in the introductory remarks of this report, de la Garza filed his motion for trial on the merits on August 6, 2009. The papers included a fifty-six page memorandum and over 700 pages of exhibits. The defendants filed their summary judgment motion on August 28, 2009. Then on September 24, 2009, four days before his response was due, de la Garza filed his current motion for an extension of time.

De la Garza argues that (1) the defendants received additional time; (2) certain papers supporting his motion for trial on the merits were misfiled; (3) he requires additional time to mail and copy his papers; and (4) prison staff in Connecticut, where he is currently incarcerated, have limited his access to his legal papers and denied him photocopies.

As this Court has observed throughout this litigation, the standard for modification of a scheduling deadline is good cause. This requires the moving party to demonstrate that its actions are consistent with due diligence. *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006); *Metro Produce Distribs., Inc. v. City of Minneapolis*, 473 F.Supp.2d 955, 964 (D.Minn. 2007).

Considering the volume of his submissions to this point, de la Garza does not appear to face substantial obstacles to his ability to mail or copy papers. And to show interference with his papers by prison staff in Connecticut, he offers some of his correspondence with that staff. But the latest correspondence dates from August 21, 2009, about five weeks before de la Garza was expected to respond to the defendants' motion. For this reason, this correspondence does not meaningfully demonstrate why de la Garza could not diligently meet the filing deadline.

De la Garza otherwise does not show how, notwithstanding his due diligence, he could not timely respond to the defendants' motion. This Court finds no good cause for an extension here, and therefore, the motion for additional time is properly denied.

Through a motion to correct the record (Doc. No. 178), de la Garza argues that the Clerk of Court did not properly docket some of his papers, and he requests that the docket be corrected. He alleges that the memorandum supporting his motion for trial was not filed, and that his other supporting affidavits were not docketed properly.

The docket shows that the supporting memorandum was filed and, notwithstanding how the supporting affidavits were docketed, they are organized enough to permit meaningful judicial review. It also should be noted that this Court that has considered the affidavits from de la Garza and, as the appendix to this report illustrates, those affidavits have informed the discussion here. Under these circumstances, there is no need to correct the record, and de la Garza's motion for such relief should also be denied.

## III.    CONCLUSION

In his complaint, de la Garza advances multiple claims against the defendants pursuant to § 1983, which are presented in eight separate counts. The claims may be framed into five areas, being that the defendants (1) limited or denied his access to the courts; (2) engaged in retaliation or retaliatory discipline against him; (3) maintained unlawful conditions of confinement in the disciplinary segregation unit; (4) violated procedural due process when placing him in that unit; and (5) engaged in racial discrimination when deciding which prisoners to place in that unit.

In accordance with the standard of review for summary judgment, taking all reasonable inferences for the nonmoving party, none of the claims are viable:

- Because de la Garza has not shown how the misconduct of prison officials affected the outcome of his litigation, his access-to-courts claims fail for lack of an actual injury.

- Assuming any retaliatory conduct occurred, there is insufficient evidence that the defendants either directly participated in this conduct, or that they failed to train or supervise the subordinates who engaged in this conduct. So these claims are resolved by principles of supervisory liability.

- As there is no clearly established law that would give the defendants fair warning that the conditions of confinement in the disciplinary segregation unit are unconstitutional, the defendants are shielded by qualified immunity against these claims.

- Assuming that de la Garza has a due process liberty interest in connection with his placement in disciplinary segregation, such that he is entitled to procedural due process, the record establishes that he received all process that is due.

- There is no evidence to show that the defendants engaged in racial discrimination, and therefore, equal protection claims based on such discrimination are without merit.

This Court accordingly concludes that the defendants are entitled to summary judgment and their motions should be granted. To the extent that de la Garza seeks a trial or other relief inconsistent with summary judgment, therefore, his motions are properly denied.

## IV.    RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.    The defendants' motion for summary judgment (Doc. No. 165) be **GRANTED.**

2.    De la Garza's motions for trial on the merits (Doc. No. 156) and jury trial (Doc. No. 176) be **DENIED.**

3.    De la Garza's motion for a ruling on nondispositive motions (Doc. No. 140) be **DENIED AS MOOT.**

4.    De la Garza's motions for appointment of counsel (Doc. No. 175), for extension of time to respond to summary judgment (Doc. No. 177), and to correct the record (Doc. No. 178) be **DENIED.**

5.    All claims under § 1983 be **DISMISSED WITH PREJUDICE** and, to the extent de la Garza pleaded state-law claims, those claims be **DISMISSED WITHOUT PREJUDICE.**

6.    This litigation be closed and judgment entered.

Dated this 30th day of November, 2009.

s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge


## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **December 14, 2009**.  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.

# APPENDIX[4]

Exh. 1      Answer [Doc. No. 75].

Exh. 2      Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-22") [Doc. No. 159-6].

Exh. 3      Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-20") (Letter of M. Vasely, Dec. 23, 2005) [Doc. No. 159-4 at 17].

Exh. 4      Aff. of K. Hudson, Aug. 26, 2009, Exh. Q (Receipt of Dec. 13, 2005) [Doc. No. 168].

Exh. 5      Aff. of K. Hudson, Sept. 8, 2009, Exh. I (Report of J. Symmes, Apr. 20, 2006) [Doc. No. 173].

Exh. 6      Aff. of K. Hudson, Aug. 26, 2009, Exh. Q (Letter of M. Vasaly, June 15, 2005) [Doc. No. 168].

Exh. 7      Aff. of K. Hudson, Aug. 26, 2009, Exh. Q (Report, *Hines v. Anderson*, No. 73-387 (D.Minn. Nov. 4, 2004)) [Doc. No. 168].

Exh. 8      Aff. of K. Hudson, Aug. 26, 2009, Exh. R (Order, *Hines v. Anderson*, No. 73-387 (D.Minn. Dec. 13, 2005)) [Doc. No. 168].

Exh. 9      Aff. of L. Stevenson, Aug. 27, 2009 [Doc. No. 167].

Exh. 10     Aff. of K. Hudson, Sept. 8, 2009, Exh. H (ACU Handbook (rev. Oct. 27, 2003)) [Doc. No. 173].

Exh. 11     Aff. of K. Hudson, Sept. 8, 2009, Exh. H (ACU Handbook (rev. Oct. 20, 2005)) [Doc. No. 173].

Exh. 12     Aff. of K. Hudson, Sept. 8, 2009, Exh. G (Report of E. Skon, Aug. 10, 2006) [Doc. No. 173].

Exh. 13     Aff. of K. Hudson, Sept. 8, 2009, Exh. G (Report of J. Symmes, July 21, 2006) [Doc. No. 173].

Exh. 14     Aff. of K. Hudson, Sept. 8, 2009, Exh. G (Notice of June 6, 2006) [Doc. No. 173].

---

[4]      This Court has found some inconsistencies in how de la Garza has numbered and labeled the exhibits to his affidavits.  To avoid confusion, this Court includes page citations to particular docket numbers, rather than relying on the lettering or numbering on the exhibits or affidavits.

Exh. 15          Aff. of K. Hudson, Sept. 8, 2009, Exh. E (Report of E. Skon, Jan. 19, 2005) [Doc. No. 173].

Exh. 16          Aff. of K. Hudson, Sept. 8, 2009, Exh. F (Report of E. Skon, Nov. 7, 2005) [Doc. No. 173].

Exh. 17          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-21") (Mems. of J. Norman, May 6, 2004; May 18, 2004; May 24, 2004) [Doc. No. 159-5 at 80, 84, 87].

Exh. 18          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-21") (Mem. of J. Norman, July 19, 2004) [Doc. No. 159-5 at 139].

Exh. 19          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-21") (Minn. Dep't of Corrections, Division Directive 204.045 (July 1, 2005)) [Doc. No. 159-3 at 9].

Exh. 20          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-14") (Report of L. Dingle, Dec. 29, 2004) [Doc. No. 158-13 at 3].

Exh. 21          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-14") (Report of E. Skon, Jan. 19, 2005) [Doc. No. 158-13 at 6].

Exh. 22          Compl. [Doc. No. 1].

Exh. 23          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Report of E. Skon, February 10, 2005) [Doc. No. 158-8 at 36].

Exh. 24          Aff. of K. Hudson, Sept. 8, 2009, Exh. B (Kite of C. de la Garza, May 1, 2005) [Doc. No. 173].

Exh. 25          Aff. of K. Hudson, Sept. 8, 2009, Exh. B (Mem. of L. Stevenson, June 10, 2005) [Doc. No. 173].

Exh. 26          Aff. of K. Hudson, Sept. 8, 2009, Exh. B (Report of L. Dingle, June 13, 2005) [Doc. No. 173].

Exh. 27          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Kite of C. de la Garza, Sept. 12, 2005) [Doc. No. 158-8 at 72].

Exh. 28          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Kite of C. de la Garza, Sept. 18, 2005) [Doc. No. 158-8 at 74].

Exh. 29          Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Report of J. Symmes, Oct. 12, 2005) [Doc. No. 158-8 at 78].

Exh. 30  Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Report of E. Skon, Oct. 23, 2005) [Doc. No. 158-8 at 82].

Exh. 31  Aff. of K. Hudson, Sept. 8, 2009, Exh. D (Report of E. Skon, Oct. 31, 2005) [Doc. No. 173].

Exh. 32  Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-9") (Kites of C. de la Garza, Jan. 8, 2006; Jan. 13, 2006; Jan. 14, 2006; Jan. 20, 2006; Feb. 16, 2006; Apr. 6, 2006; Apr. 8, 2006; Apr. 10, 2006; Apr. 19, 2006; Apr. 23, 2006; Apr. 24, 2006) [Doc. No. 158-8 at 84-94].

Exh. 33  Aff. of C. de la Garza (unsworn), July 13, 2009 ("Affidavit Exhibit-5") (Defs.' Response to Requests for Admissions, Apr. 24, 2009) [Doc. No. 158-4 at 4].

Exh. 34  Aff. of K. Hudson, Aug. 26, 2009, Exh. I (Report of Apr. 17, 2009) [Doc. No. 168].

Exh. 35  Aff. of K. Hudson, Aug. 26, 2009, Exh. H (Report of Apr. 22, 2009) [Doc. No. 168].

Exh. 36  Aff. of K. Hudson, Aug. 26, 2009, Exh. A (Minn. Dep't of Corrections, Policy 303.010 (Aug. 1, 2002) ("Offender Discipline")) [Doc. No. 168].

Exh. 37  Aff. of K. Hudson, Aug. 26, 2009, Exh. D (Minn. Dep't of Corrections, *Offender Discipline Regulations* (2005)) [Doc. No. 168].

Exh. 38  Aff. of K. Hudson, Aug. 26, 2009, Exh. L (Records of Disciplinary Charge No. 349997) [Doc. No. 168].

Exh. 39  Aff. of K. Hudson, Aug. 26, 2009, Exh. M (Records of Disciplinary Charge No. 359634) [Doc. No. 168].

Exh. 40  Aff. of K. Hudson, Aug. 26, 2009, Exh. A (Minn. Dep't of Corrections, Policy 303.010 (Feb. 1, 2005) ("Offender Discipline")) [Doc. No. 168].

Exh. 41  Aff. of K. Hudson, Aug. 26, 2009, Exh. L (Notice of Rights (undated); Notice of Violation (Nov. 11, 2004); Mem. of L. Dingle (Dec. 13, 2004)).

Exh. 42  Aff. of K. Hudson, Aug. 26, 2009, Exh. M (Notice of Rights (undated); Notice of Violation (Aug. 8, 2005); Findings of N. Fitzloff-Meyer (Oct. 27, 2005); Mem. of J. Symmes (Sept. 2, 2005)).